BEAUMONT, S. L. & W. RY. CO. v. BISHOP.

(Court of Civil Appeals of Texas. Austin. Nov. 12, 1913.)

1. CARRIERS (§ 271*) — TRANSPORTATION OF PASSENGERS—CONTRACT—BREACH — ALIGHTING BEFORE REACHING DESTINATION.

Where a carrier contracted to transport a passenger from one station to another, and notified him to alight before his destination was reached, and left him at a point short of such destination, there was a breach of contract for which the passenger was entitled to recover damages.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1067–1071; Dec. Dig. § 271.*]

2. CARRIERS (§ 262*) — TRANSPORTATION OF PASSENGERS—NATURE OF LIABILITY.

A carrier's contract to transport a passenger from one station to another is absolute and unconditional, while the contract for safety only requires the exercise of a specified degree of care.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 262.*]

3. CARRIERS (§ 277*) — TRANSPORTATION OF PASSENGERS — CONTRACT — BREACH — DAMAGES.

Plaintiff boarded defendant's train, and paid for transportation to a specified station, but was notified by the conductor to alight at night at a public road crossing some distance before the station was reached. Plaintiff had made an appointment with the hack driver to meet and carry him to his ultimate destination, and, not meeting this person, he walked over a heavy country road, carrying a heavy grip, through weeds and nettles, for more than a mile to a crossroad, where he met the hackman. His limbs were torn by the nettles, and he was very much exhausted by reason of an existing physical defect in his hip, and was laid up for three or four days, but suffered no permanent injury. Held, that a verdict awarding him $500 was excessive, and should be reduced to $200.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1082–1084; Dec. Dig. § 277.*]

Appeal from Liberty County Court; I. B. Simmons, Judge.

Action by P. H. Bishop against the Beaumont, Sour Lake & Western Railway Company. Judgment for plaintiff, and defendant appeals. Reversed on condition.

Stevens & Stevens, of Liberty, and Andrews, Ball & Streetman and McDonald Meachum, all of Houston, for appellant. Marshall & Harrison, of Liberty, for appellee.

KEY, C. J. In this case the plaintiff recovered a verdict and judgment for $500 for injuries alleged to have resulted from the action of a railroad conductor, which misled and caused the plaintiff to get off of a train upon which he was traveling about a mile before reaching his destination.

[1, 2] We have considered all the assignments presented in appellant's brief, and conclude that no reversible error is shown except by the assignments which complain of the verdict as excessive. Appellee's suit is predicated upon the proposition, which is sustained by his own testimony, that for a consideration of 55 cents paid by him appellant contracted to transport him from one of its stations to another, and that it breached that contract. Hence we overrule the assignments which present the contention that the court should have submitted to the jury whether or not appellant was guilty of negligenc. The contract was not merely that appellant should use a certain amount of care and diligence to transport appellee to his destination; but the agreement was that appellant would transport him to that place, and it failed to do so, and, if not prevented by an act of God, or the public enemy, or appellee's own conduct, then appellant breached the contract, and appellee was entitled to recover damages. The contract for carriage or transportation was absolute and unconditional, though the contract for appellee's safety was not, and as to the latter appellant was only required to exercise a certain degree of care.

[3] The verdict for $500 rests upon the testimony given by appellee, which we here copy from the statement of facts:

"P. H. Bishop, a witness for the plaintiff, having been duly sworn, testified: That his name was P. H. Bishop, and he was the plaintiff in this case. That he lived at Fouts, about 12 miles north of Liberty, in Liberty county, Texas. That on about the 17th day of July, 1911, his home was at Dayton. That he was working for a publishing company, selling maps, and he was going from Hull to Martha on the Beaumont, Sour Lake & Western Railroad, which railroad runs through Liberty county. That this railroad has a station at Hull, and he thinks that Martha is a flag station. That witness took the train at Hull on or about the 17th day of July, 1911, late in the night; the train being 1½ hours late. It was a rainy day, and had rained all evening. He came from Batson on a hack, and 'it rained hard on me all day.' There was a ticket agent at Hull up to 6 o'clock. I had made arrangements with Mr. Hunnicutt to meet me at Martha. I telephoned Mr. Hunnicutt to meet me at Martha. I got aboard of the train at Hull, and took a seat. I told the conductor I wanted to go to Martha, and he said, "Fifty-five cents;" and I paid it, and he said, "There is no town there." I said, "I telephoned a man at Dayton to meet me there with a horse and buggy." I told him I had never been at the place. While I had never been there, I went through there one time. I do not know whether there is any depot at Martha. I got on on the west end of the car, and took

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes.

a seat on the left, on the north side going west. I got off at a public road crossing, and about one mile this side, east, of Martha. They stopped there, and the conductor told me that was the place to get off. After the train started, and left me, I looked around, and I couldn't see any one, and I hollowed. No one didn't answer me, and I thought at the time that Mr. Hunnicutt had sent a negro after me, and he had turned and went back on account of the train being late. I was never there before. I hollowed several times, and no one answered me, and I, of course, knew the direction of Dayton, where I wanted to go. It was in the edge of the timber, and I could see the bulk of the road, and I started out the road. I went down the road, I suppose, about a mile, and was carrying a grip and a coat. The road was in bad condition. It was muddy—black land, and was muddy. It had been raining for several days, and had rained that evening, that night, the early part of the night, and it was in bad condition. The bull nettles was up this high. I was crippled in one leg at the time, and am crippled yet. The grip weighed something like 25 pounds. I didn't meet any one. Me and Mr. Hunnicutt come together. He was at Martha, he told me, when the train stopped there, and he had to come back going to Dayton, and the roads come together there like that, and we come together. He had to come to the road that went down to where they put me off, and I went with him to Dayton in his hack. When Mr. Hunnicutt met me, I was given out. I couldn't have walked a hundred yards further at all. It done me up. I was sore all over, just sore and stiff, and my ankles were all torn up with bull nettles, and skinned, and torn. You know what bull nettles will do to you. I had on low quarter shoes. When I got to Dayton, I went in the house, and told my wife I was all done up, and told her about the circumstances, and told her I would like to get some hot water, and bathe my legs, and she said she thought she could rub them with liniment, and make out till morning. I was in bed at least three days, three or four days. I told Mr. Hunnicutt I would be up-town in the morning, and pay him. I didn't think about it making me so sore, and I would pay him. I didn't go up there until three days, three or four days; then I paid him when I went up there. I was in bed laying on a bed and on a cot. It is my left leg which is crippled. I had hip disease, and it got stiff in the joint. It is weak, and I cannot walk without a stick to do any good, and I was in the same condition that night. (Witness here stood up, and jury looked at him.) I can walk just around in town a short distance, not carrying a grip. I was very much fatigued. I was in bed three or four days after that.'

"On cross-examination: 'I suggested it myself that I telephone Mr. Hunnicutt to meet me. I didn't request the conductor to slow up at the crossing, and I did not know I was one mile east of Martha. I was never on that road crossing before. It is not easier to get to that crossing, much more easy, than to go to Martha, and it was not the place where lots of teams and buggies go to meet people. I had never been there before. It is black land, and it was muddy. I would judge my grip to weigh 25 pounds. I had stationery in it. It was about 2 feet long and 18 inches high. I had probably one-half dozen maps in it, maybe more. I had other stationery in there, cards and packages. I had no pen and ink, but had some envelopes; cannot tell how many. I hardly think they would have weighed 25 pounds. The bull nettles were growing right out in the middle of the road. It was what I call the bull nettle, with briars and stickers on them. I would come on them, and they would sting, and keep stinging. I account for them growing on that road because they changed the grade, and this road had not been traveled in probably a year, or something like that. I have brought suit for $995.'

"The witness was then asked the following question: 'Would you walk over that same road again under the same conditions for $775, or for $500, of for $100? If a man offered you $100 in cold cash to go over the same road under the same circumstances, and the same old bull nettles, would you do it for $100? A. That was under different circumstances. The circumstances were different, because I was put off the train at night. I don't know whether I would or not, for $100 in cold cash, go through one mile under the conditions, same old bull nettles. I had never been there before, and they told me that wolves were over there. It was dark, and I didn't have any gun, and they told me that there were lots of wolves over there. I was told this by Pruett's cowmen. I don't suppose Mr. Hunnicutt ever mentioned it to me in his life. I did not tell Mr. Hunnicutt I was glad to meet him on account of wolves. I worked for the railroad company, but was not fired, and I did not ask them to reinstate me. ·I had no trouble with the railroad company about a job. I worked as yard foreman, quit of my own accord, and have a clearance from the company. It was very dark, and I didn't see any wolves that night. I didn't measure how deep I went into the mud, and cannot tell how many bull nettles I ran into, as I couldn't see them. The mud went over my shoes. I had on low quarter shoes. It was cloudy. I didn't see any moon. It rained a whole lot in July. I said this to the conductor when I got on the train: I told him I was going to Martha, and he said, "Fifty-five cents;" and I paid him, and he told me, "There is no town there;" and I said, "That is all right; I telephoned." I don't know whether I told him I telephoned or not, but told him that a party was going to meet me from Dayton with a horse and buggy, and he

said, "That is all right." I believe he asked me if I had even been to the place, and I told him I had never been to the place. There was a gentleman sitting beside me, and he said, "That conductor charged you four cents a mile;" and I said, "I will speak to him." I asked the conductor if he charged me four cents a mile, and he said, "No; it is 55 cents to Martha." There was a couple of gentlemen and a lady there before I got on the train. I saw Mr. Rodrigo there. He is the man that sat beside me on the train. He took the right-hand side, and I took the left-hand side, and he got up, and came and sat beside me. I was sober, and did not drink a drop at the time. I had been on that train from Houston to Beaumont three years before. The conductor opened the door, and stepped in, or stuck his head inside, and said, "Here is your place to get off." He didn't say, "Martha;" he said, "Here is your place to get off;" and I got up, and got my bundle, and got off. I made no effort to get off before that. It is not a fact that the train slowed down just before that, and I started to get off. He said, "Here is your place to get off." If he called out, "Martha," I did not hear him. I think I had walked about a mile when I met Mr. Hunnicutt. The porter stepped off the train right ahead of me. There was no words or fuss between me and the trainmen. They were perfect gentlemen to me. I do not think it was cold that night. I think it was warm. I did not take pneumonia; I caught a cold. I know I was sore inside in my lungs, and sore outside, and sore all over. I first got sore on the lungs in the morning, and never noticed it that night. I noticed my ankles were all torn up; they were scratched and bleeding. They did not bleed very much, but were scratched. They bled through my socks. I discovered this after I took off my shoes. The bull nettles did that. I did not get a doctor, and was in bed three or four days; the fourth morning I went down town. I was laying down all the time, and sitting up in a rocking chair part of the time. It was the fore part of the night. It rained while I was coming from Batson to Hull very bad. I did not get wet; was in a hack, a covered hack. It must have rained half an hour, at least. I never got wet then in the hack. There was no cause for me to take cold then; no more than there would be with me sitting in my house while it was raining. It didn't rain after I got off the train until after I met Mr. Hunnicutt. I cannot tell whether I walked on the side of the road or in the center of the road. I couldn't tell whether the road had been cut up by heavy traffic. It was very dark. I was not accustomed to walking long distances. When I go round selling goods, I walk around in town. I do not remember whether I testified on the former trial of this case that at that time I

was used to, and in the habit of, doing a great deal of walking. Just like I told you then, I was walking around on the streets; maybe meet a man here, and in ten feet further meet another man, and on like that. I generally had paved streets to walk on, and in daytime always. I do not suppose my general health has been damaged by reason of walking on that muddy road that night, after I got well. I received no permanent injury. I am positive I made no request of the conductor to put me off at that cross-road. I have told you the honest truth all the way through, and hope that I may die if I haven't. I had to change my clothes. My pants were very muddy; the mud went over my shoes. I slipped in over my ankles several times. I didn't think about anything only getting out of that place. I hollowed after the train left me; I suppose after the train got out of hearing. Every little piece I would go I would hollow, thinking a dog would bark. I heard something sliding through the water I thought was a wolf; but this is not a part of the damage, and the wolves have nothing to do with the case. I can't remember which cowboy of Mr. Pruett's told me about the wolves. I didn't pay any attention to it at the time and didn't write his name down in the book. I lived there, and heard several people speak about them being over there eating Pruett's cattle and his young calves, but never heard of them eating a man. It was as safe for me to attempt to walk as it was for me to remain there after I got off the train. There is no fence there. There is no railroad fences there. There is no rock pile there. It must have been something like an hour after I got off the train before I got to Hunnicutt's hack. I do not know just exactly how long. I stopped several times, and blowed. I can't walk very fast, even on good roads. I do not think it was over a mile that I had to go.' Q. 'A person can take cold from becoming very warm, and sweating, and cooling off?' Answer of the witness: 'Yes; that was the cause. I was sweating; was wet with sweat, and getting in the buggy, and riding, and cooled off. Of course I didn't get cold, or anything like that.'

"On recross-examination: 'I had taken cold; my lungs were sore on the inside. I was not scared that I would take pneumonia. I told my wife just what had occurred. I wasn't so sore and stiff until the next morning. Of course my ankles were sore; they were bad that night, just as bad as next morning. I first told Mr. Hunnicutt that I was put off at the wrong place. When he met me he told me that was Martha where he was at. That was the first I knew of it. He said he had been up there. I had not caught cold when I was with Mr. Hunnicutt. I did not tell him I was sick. I don't remember when I decided to bring suit; but it was some time after that. I decided the

railroad had done me wrong. I had paid my money to go to Martha, and they failed to carry me there. I was put off from Martha about one-half mile on the railroad track. If I had gone on the railroad track, I would have been in mighty bad shape, as I would not have struck Mr. Hunnicutt at all. I did not know when I started off on that walk that I was going to meet Mr. Hunnicutt. I do not know whether there was a shed at Martha or not. I was put off about one mile from Martha. I thought I was at Martha when he put me off there, and that is the reason I did not go down that track. I did not have any business at Martha.'

"On redirect examination: 'My business called me to Dayton that night, and when I got off at that place I thought I was at Martha. I had no reason to walk up the railroad track. I struck out in the direction of Dayton, and I was a stranger there besides.'"

The measure of the plaintiff's damage is such sum of money as will actually and adequately compensate him for the injuries sustained, and our conclusion is that the sum of $200 will be amply sufficient for that purpose, and therefore, if within 20 days from this date appellee files a remittitur for the sum of $300, the judgment will be reformed and affirmed for $200; otherwise the case will be reversed and remanded. Railway Co. v. Dennis, 4 Tex. Civ. App. 90; 23 S. W. 400; Railway Co. v. St. John, 13 Tex. Civ. App. 257, 35 S. W. 501; Railway Co. v. Berry, 84 S. W. 258; Railway Co. v. Russell, 38 Tex. Civ. App. 291, 85 S. W. 299; City of Austin v. Browning, 150 S. W. 961.

The cases cited by counsel for appellee are not analogous. In fact, some of them merely announce the general proposition of law that applies when a passenger is wrongfully expelled from a train, and these which discuss the question of excessive verdict are cases in which the injured parties were women who suffered great humiliation or fright, both of which elements are entirely absent from the case at bar.